ROBERT MORROW, *et al.*, v. COUNTY COMMISSIONERS OF SALINE COUNTY.

1. SPECIAL QUESTIONS TO JURY; *Answers.* Where special questions are submitted to a jury, the answers returned by them should be direct and positive.

2. ANSWER, *"We don't know,"* *Tantamount to a Simple Denial.* Where to a question the jury respond "We don't know," or in any like manner, such an answer is tantamount to a simple denial, for if from the testimony the jury do not know whether an alleged fact exists, it follows that the testimony does not show that it exists, and therefore for the purposes of the case it does not exist.

3. ——— *Effect of such Answer.* Such an answer operates against the party whose case needs the support of the alleged fact.

4. PETITION CHARGING CONSPIRACY TO CHEAT AND DEFRAUD, ETC.; *General Verdict against Defendants; Special Findings, When Inconsistent with Verdict.* The petition alleging that certain bonds had been voted by the county, plaintiff herein, to aid in the construction of a certain railroad, and had been placed in the hands of a trustee for delivery upon certain conditions, further charged a conspiracy among the defendants, the trustee being one, to cheat and defraud the plaintiff out of the bonds and convert them to their own use; that in pursuance of such conspiracy the trustee delivered the bonds to one of the other defendants before a compliance with the conditions of such delivery, and that the defendants sold and disposed of them to *bona fide* holders. It also alleged generally, a conversion of the bonds by the defendants. A general verdict was returned against the defendants. In response to special questions, the jury answered that there was a conspiracy between certain named defendants to obtain an improper and premature delivery of the bonds, and as to other of the defendants, that they "don't know" whether such defendants conspired to procure such delivery. *Held,* That these answers were equivalent to a finding that said last-named defendants were not parties to such conspiracy, and therefore not responsible

for the premature and improper delivery of the bonds; and further, *held,* that upon an examination of the testimony—which, so far as it connects said defendants with the transaction, was principally in deposition, and therefore fully open to review in this court—it is clear that said defendants were not members of any conspiracy to cheat and defraud the county out of the bonds, and that a verdict and judgment against them was wrong.

5. TRUSTEE, *Not an Insurer; Duties.* A trustee is not an insurer. He is bound to the utmost good faith, may acquire no interest adverse to the trust, and must exercise such care and diligence in respect to the discharge of the trust as, under all the circumstances, having regard to the magnitude of the trust and the interests involved and the consequences of mistake, would be reasonable.

6. EVIDENCE, *Improperly in Journal Entry.* Mere evidence is not properly incorporated into a journal entry, and though incorporated, will be disregarded in this court.

7. CONSPIRACY CHARGED; *Statements of Defendants.* In an action against several defendants, charged as engaged in a conspiracy to wrong the plaintiff, the admissions and statements of each defendant are competent evidence against him whether a conspiracy be proved or not.

8. JURY; *Irregularities.* Where after the case has been submitted to the jury, and on Saturday night, the jury being still unable to agree, the court adjourns until the succeeding Tuesday—the judge intending to be absent from the county the meanwhile—and directs the bailiff to keep the jury in his custody, except that he may allow them to separate at night and for meals, and then admonishes and discharges the jury until Sunday morning, and on Tuesday morning the court convenes and the jury are all present and return their verdict, *held,* that such proceedings were irregular, but that such irregularity would not in a civil case compel a reversal by this court of a judgment rendered upon the verdict without some showing of misconduct on the part of the jury or other matter of prejudice to the rights of the unsuccessful party.

9. GENERAL VERDICT, *its Conclusiveness.* Where the general verdict is against all the defendants, and as to one the answers to the special questions expressly affirm his membership in the conspiracy; and as to another are silent upon this question, *held,* that as to these two defendants the case comes within the general rule of decision in this court as to the conclusiveness of a verdict upon all questions of fact.

*Error from Ottawa District Court.*

ACTION commenced in the district court of Saline county, January 22d, 1875, by the *Board of County Commissioners of the County of Saline* against *Robert Morrow, Abram Cut-*

ler, *G. W. E. Griffith, Asa Richardson, John W. McMillan, Jeremiah G. Mohler, John K. Rankin, Andrew Terry, William A. Simpson, The Lawrence Savings Bank,* and the *Republican, Salina & Arkansas Valley Railway Company,* for the alleged conversion of certain bonds by said Saline county, issued to the railway company aforesaid. A change of venue was had and the case taken to Ottawa county, where the action was tried at the May Term, 1876, of the district court, and a general verdict rendered for the plaintiff and against the defendants, to wit: Robert Morrow, Abram Cutler, John W. McMillan, Jeremiah G. Mohler, John K. Rankin, Andrew Terry, and William A. Simpson — the jury assessing plaintiff's damages at the sum of $60,616. The jury also made special findings of fact, upon which the above-named defendants (Abram Cutler excepted) moved the court for judgment in their favor, which was denied. Judgment was accordingly rendered upon the verdict. To reverse this judgment, the above defendants have brought the case to this court for review. All necessary facts, pleadings, and proceedings are amply set forth in the opinion.

*S. O. Thacher,* for plaintiffs in error Wm. A. Simpson and J. W. McMillan.

*Samuel A. Riggs,* for plaintiffs in error John K. Rankin, Robert Morrow, and Andrew Terry.

*McClure & Humphrey,* for plaintiff in error J. G. Mohler.

*Clough & Wheat,* for defendant in error.

The opinion of the court was delivered by.

BREWER, J.: This was an action commenced in the district court of Saline county by the county commissioners of that county, to recover for the conversion of certain bonds of that county. The petition charges a conspiracy on the part of the defendants. A change of venue was had and the case taken to Ottawa county, where, after a protracted trial, judgment was rendered in favor of the plaintiff and against certain of the

defendants for $60,616. To reverse said judgment against them, the plaintiffs in error, Robert Morrow, John W. McMillan, John K. Rankin, Andrew Terry, J. G. Mohler and Wm. A. Simpson, have instituted this proceeding in error. We have given this case a very careful and thorough examination, for three reasons — 1st, the record is very voluminous, amounting to nearly 600 pages of closely-printed matter, and only by careful examination could all the facts developed in the trial receive due consideration; 2d, the amount involved is large; and, 3d, and chiefly because it presents a case altogether too common in the history of such matters, in which a county acting in good faith and with an honest desire to aid in a railroad enterprise, suddenly awakes to a realization of the fact that its bonds have passed beyond its control and into the hands of innocent holders, without a compliance with the conditions upon which those bonds were voted, and without a receipt of the consideration for which its tax-payers voluntarily assumed an onerous burden of taxation. It is, in such cases, a cheerful duty for the courts to reach out the strongest hand after the guilty perpetrators of such wrong. It is no less a duty, and a duty resting with the largest burden upon this court, to see that the eager hand of anxious justice shall touch no one innocent of the wrong. That a wrong was done to the plaintiff, no one in this case questions; but the various counsel strenuously assert that their respective clients are innocent. No one will dispute the fundamental proposition which underlies the claims of these plaintiffs in error, which is, that the mere fact that the guilty parties have used these plaintiffs in error to make profitable unto themselves the wrong, does not necessarily make such plaintiffs guilty of the wrong, or responsible to the county for the injuries received thereby. A party who purchases stolen property from a thief is guilty of no wrong, if he were ignorant of the larceny and purchased in good faith in the ordinary course of business and without notice of any facts calculated to arouse supicion or put him upon inquiry. On the other hand, it is equally true, that he who

is so destitute of moral sense as to knowingly assist a thief in the disposal of his stolen property, is seldom so impressed with the solemnity of an oath as to be unwilling to testify to his entire ignorance and innocence, and also true that the fact of his guilty knowledge is one of the most difficult things to establish by evidence; and often it is only shown by a series of minute, and, each by itself considered, apparently trifling and immaterial facts. And while this is true where the transaction is one of open, bald larceny, it is still more true where the principal accomplishes his wrong, not by direct and wrongful taking, but under semblance of law and right—by trick, overreaching, and fraud. In such case, the evidences of guilty participation are often most difficult of detection. The line which separates the guilty from the innocent assistant in the wrong, is often exceedingly hard to trace.

With these preliminary suggestions, let us proceed to a consideration of the facts in the case, and the following are undisputed: In 1871, a corporation was in existence, known as the Republican, Salina & Arkansas Valley railway company, organized for the purpose of constructing a railroad from Concordia on the north, through Saline county, south to the Arkansas river. September 18th, 1871, it submitted a proposition to Saline county for a subscription of $150,000. Such proposition, known as the second proposition, contained, among other things, these provisions:

*Statement of facts.*

The Republican, Salina & Arkansas Valley railway company propose to the county of Saline as follows: To build, equip, and operate a first-class railroad, with a gauge common to the railroads of the state, from the town of Concordia, in the Republican valley, *via* the counties of Cloud, Ottawa, Saline, and McPherson, in a southerly direction, passing through the city of Salina.

" In consideration of the above-named proposal, the county of Saline, one of the counties named, agrees to subscribe one hundred and fifty thousand dollars to the capital stock of said company, and to issue in payment therefor, bonds of said county to that amount, payable in thirty years after date, and

bearing interest at the rate of seven per cent. per annum, payable semi-annually, principal and the interest payable in the city of New York.

"If at an election to be held in said county of Saline to determine the question of such subscription and the disposal of the stock so to be subscribed upon the terms set forth in this proposal, a majority of all the votes cast at such election shall be found to be in favor of such subscription, and such disposal, then such subscription shall be made in the manner prescribed by law, and bonds to the amount of such subscription shall be prepared and delivered to such persons as the county commissioners and said railway company shall agree upon as trustee.

"Said bonds to be held by said trustee until said line of road is completed as follows: *When said company have graded the road and put in the proper masonry through the county of Saline,* then it shall be the duty of said trustee, when said work is thus completed as stipulated, to pay and deliver to said railway or their assigns, *on the certificate of governor of the state of such completion, the sum of fifty thousand dollars of such bonds,* so held, cutting off the interest-bearing coupons to the date fixed *in the certificate of said governor of the state, showing when said grading and masonry were completed from the county line to the town of Salina,* and said interest-bearing coupons, when so cut off, shall be delivered to the county treasurer of the county of Saline for the disposal of the county. And when said company shall have put down the ties, built the bridges, put on the rails, and have so completed the road that it can be operated from the south boundary line of the county to the town of Salina, then said trustee shall deliver to said railway company or its assigns, when thus due, the further amount of fifty thousand dollars of such bonds, and the remaining sum of fifty thousand dollars, to be delivered to said company or its assigns, on the completion and operation of the road through the said county of Saline. But no bonds issued to said company shall draw any interest prior to the date fixed in the certificate of the governor determining that said road has been properly graded, and the masonry completed, to the town of Salina, which date thus fixed shall be the date of accruing interest on the bonds; and if the railway company deem it best to build from the town of Salina to the northern boundary of the county, rather than to, or from the southern boundary first, then this proposition shall be so construed that the said

company may build from Salina north or south, or to Salina from north boundary or the south boundary as deemed best by said company, and the payments shall fall due in the same manner as if said road had been built from the southern boundary of the county.

"Certificates of stock in the capital stock of said company shall be issued by said company to said county of Saline at the time specified for payments of the several installments of bonds by said company."

The proposition was submitted to a popular vote, October 24th, 1871, and carried. After this vote, the matter seemed to rest in abeyance until the spring of 1873, when Abram Cutler appeared on the scene. March 15th, 1873, he entered into a contract with said railway company to construct that portion of its road running through Saline county. As part payment, he was to receive the bonds of Saline county, the same to be delivered to him at the times and in the manner specified in the proposition of the company to the county. March 18th, 1873, the company signified to the county that it was ready to proceed with the building of the road, and on the 19th the county commissioners passed a resolution directing its chairman to make the subscription, directing, also, the preparation of the bonds and their delivery to Winslow, Lanier & Co., bankers of New York city, the trustee agreed upon by all parties, such delivery to be accompanied by a copy of the proposition and of the proceedings of the county board. In pursuance of this resolution the subscription was made. On the 29th of March the commissioners met in special session and passed a resolution directing that no bonds should be delivered to the trustee until the company had given to the county a bond in the sum of $150,000, conditioned for its performance of the terms of the proposition. On April 1st, only the third day thereafter, the commissioners again met and made an order expunging its resolution of March 29th, and in lieu thereof approved a contract between the company and the county, whereby the former agreed to comply with the terms of the proposition in regard to building, equipping and operating a railroad through Saline county,

and elected to build and equip that part of the road lying south of the city of Salina before commencing the grading on the line north of Salina. The bonds, 150 in number, of the amount of $1,000 each, fully executed, were thereafter taken to New York by the chairman, and delivered to Winslow, Lanier & Co. The latter, however, refused to accept the trust, and merely received the bonds as an accommodation until the parties in interest could agree upon a new trustee. June 11th, 1873, there appears of record in the proceedings of the county commissioners these resolutions and orders:

"SALINA, KAS., June 11, 1873.

"Members all present as yesterday. It was resolved that, whereas, on the 21st day of March, A. D. 1873, one hundred and fifty (150) bonds, of the denomination of one thousand (1,000) dollars each, were issued by the county of Saline, Kansas, in aid of the Republican, Salina & Arkansas Valley railway company; and whereas, by an order of the board of said county commissioners of Saline county, said bonds were placed on deposit with Messrs. Winslow, Lanier & Co., bankers in New York city, as trustees; and whereas, the said Winslow, Lanier & Co., bankers as aforesaid, have refused to accept said bonds and act as such trustees, it is hereby ordered that the Lawrence Savings Bank, of Lawrence, Kansas, whereof Andrew Terry is president, Charles Robinson vice president, and John K. Rankin cashier, be and is hereby appointed trustee for said bonds, to keep the same safely and to deliver the same in accordance with the terms of the proposition upon which said bonds were voted for, on the 24th day of October, A. D. 1871, a copy of which accompanies the bonds, and also in accordance with the agreement and election of the said party of the second part, under the said proposition, which is as follows, to wit: 'To first build and equip that part of the said line of road lying south of the city of Salina, before commencing the grading on the line north of Salina.'

"And it is further ordered, that Abram Cutler & Co., commissioner H. F. Woolley, be required to give their respective orders on Messrs. Winslow, Lanier & Co., in favor of said Lawrence Savings Bank, as trustee for the said one hundred and fifty (150) bonds as aforesaid, (the said orders having been approved by Abram Cutler, assignee.)

"And be it further ordered, in the following words, to wit: Having this day passed over, viewed and inspected the grading and masonry of the Republican, Salina & Arkansas Valley railway, through the county of Saline, from the south county line to the city of Salina: therefore,

"*Resolved*, In our opinion the same is graded, and the proper masonry is put in on said line of railway in accordance with the meaning and true intent of the second proposition submitted to and voted upon by the people of Saline county on the 24th day of October, A. D. 1871.

"Board adjourned.

"[L. S.]                    D. BEEBE, *County Clerk.*"

And on the same day the chairman wrote an order, concurred in by Cutler, to Winslow, Lanier & Co., to deliver the bonds to the Lawrence Savings Bank. The bonds were obtained from Winslow, Lanier & Co. by Andrew Terry, the president of the savings bank; $100,000 of them left on deposit in New York city, and the remaining $50,000 brought to Lawrence and left with the savings bank there. A formal acceptance of this trust was executed, on behalf of the bank, by one Charles S. Treadway, assistant cashier. No date appears to this acceptance, and it is not clear from the testimony when the bonds were obtained from Winslow, Lanier & Co., whether before or after the date of the resolution above named. On the 23d of June, 1873, the $50,000 of bonds were registered in the auditor's office at Topeka. With the auditor was filed a certificate of the governor and indorsement of the attorney general. It would appear probable from the testimony, that these bonds were not registered during ordinary business hours, and also that the attorney general did not write his indorsement on the certificate until after the bonds had in fact been registered; but it is unquestionable that the certificate of the governor was obtained at about the day of its date, and the indorsement of the attorney general made within a day or so of the registration. Such certificate and indorsement are in these words:

" Whereas, by the terms of a proposition voted upon by the legal voters of Saline county, Kansas, on the 24th day of October, 1871, a copy of which is hereto attached, that the

governor of the state of Kansas, upon conditions therein named, shall issue this certificate; and whereas, it has been made to appear by the affidavit of A. D. Searl, H. W. Jameson, H. C. Jones, Wm. Armstrong, and C. W. Wiley, now on file with me, and by a certificate of the county attorney of Saline county, Kansas, and a letter from S. M. Palmer, a county commissioner of said county of Saline, that the Republican, Salina & Arkansas Valley railway company did have said railway graded, and the proper masonry put in, through the county of Saline, Kansas, from the town of Salina to the county line of Saline county, Kansas, on the 19th day of May, 1873, in conformity to the terms of the proposition above referred to:

"Now, therefore, I, Thomas A. Osborn, governor of the state of Kansas, on the information above cited, do hereby certify that the said Republican, Salina & Arkansas Valley railway company did have the said railway graded, and the proper masonry put in, on the 19th day of May, 1873, through the county of Saline from the town of Salina, Saline county, Kansas, to the county line of said county, in conformity to the terms of the proposition, a certified copy of which is hereto attached.

"In testimony whereof, I have hereunto subscribed my name and caused the great seal of state to be attached, at Topeka, this 4th day of June, A. D. one thousand eight hundred and seventy-three, and this tenth year of the state.

THOMAS A. OSBORN.

"By the Governor:

"[L. S.] W. H. SMALLWOOD, *Secretary of State.*

"The bonds within described are entitled to registration.
Topeka. A. L. WILLIAMS, *Attorney General.*"

On June 24th the bonds were delivered to Robert Morrow under an order from Cutler, the contractor, of date April 15th, 1873. At least, that is the date of the receipt to the bank therefor, and the date of the actual delivery as the jury find, though the testimony of the clerk of the auditor is to the effect that Cutler and Morrow presented the bonds for registration. Of these bonds, six passed into the possession of defendant Mohler, being left by Morrow in the savings bank for him. Forty-four passed from Morrow into the possession of defendant McMillan. McMillan transferred

thirty of these to defendant Richardson, twelve to defendant Rankin, and two back to Morrow. On June 26th, 1873, the county commissioners, having heard of the registration and delivery of these bonds, met, and passed a resolution denouncing such delivery as a wrong upon the county, and directing the county attorney to institute legal proceedings against the bank; also, directing the chairman to telegraph to the presidents of certain boards of stock exchange that the bonds had been obtained by fraud, and that their payment would be resisted. And telegrams were accordingly sent to such parties giving that notice. The following is a copy of one:

"SALINA, KAS., June 27, 1873.

"*To the President of Stock Exchange, Boston, Mass.:* Fifty thousand dollars Saline county railway bonds were wrongfully obtained. Payment will be contested.

"H. F. WOOLLEY,

"*Chairman Board Co. Com.*"

Several meetings of the board were had on succeeding days, and many resolutions concerning the bonds considered, and some passed. On July 17th following, this telegram was sent to the various parties to whom the former telegram had been sent, and also to the savings bank:

"SALINA, KAS., July 17, 1873.

"*To the President of the Board of Stock Exchange, Boston, Mass.:* Our telegram of June 27th, 1873, having reference to fifty thousand dollars Saline county bonds issued to aid in constructing the Republican, Salina & Arkansas Valley railway, is hereby withdrawn. By order of board of county commissioners. H. F. WOOLLEY,

"*Chairman Board Co. Com., Saline Co., Kas.*"

This action grew out of these matters. On July 8th, 1873, the following proposition was made to the county:

"*To the Hon. Board of County Commissioners, Saline Co., Kansas* — GENTLEMEN: On behalf of the Lawrence Savings Bank, as also on behalf of Robert Morrow and the holders of the bonds of Saline county, Kansas, issued in aid of the Republican, Salina & Arkansas Valley railway, I request a retraction or withdrawal of the telegram of the chairman of the board of county commissioners, Saline county, Kansas,

and David Beebe, county clerk, Saline county, Kansas, to the president of the stock exchanges of New York, Philadelphia, Boston, Chicago, St. Louis and Kansas City, discrediting $50,000 of Saline county bonds. And I also offer and propose in behalf of said savings bank and Robert Morrow to the county of Saline, Kansas, through its board of county commissioners, as follows: To give a good, sufficient and legal bond in the penal sum of $100,000, conditioned to save Saline county, Kansas, harmless from any damages by reason of the delivery of the $50,000 in Saline county bonds, should the said county be in anywise damaged by reason of any premature delivery of said bonds.        W. W. NEVISON,

"*Att'y for Lawrence Sav'gs Bank and Robt. Morrow, et al.*
"SALINA, KAS., July 8, 1873."

On July 15th this proposition was accepted by the commissioners. On July 16th the following bond was executed:

*Know all men by these presents,* That we, the Lawrence Savings Bank, of Lawrence, Kansas, as principal, and Robert Morrow, and J. W. McMillan, and W. A. Simpson, of Lawrence, Kansas, as sureties, are held and firmly bound unto the board of county commissioners of the county of Saline, in the state of Kansas, in the penal sum of one hundred thousand dollars, to the payment of which, well and truly to be made, we do hereby bind ourselves and each of us, our heirs, executors and administrators, firmly by these presents.

Witness our hands, at Lawrence, in the county of Douglas and state of Kansas, this the 16th day of July, A. D. 1873.

The condition of this obligation is such, that whereas, the said Lawrence Savings Bank was heretofore chosen by the board of county commissioners of said county of Saline, and the Republican, Salina & Arkansas Valley railway company, trustee to receive, hold and deliver certain bonds of said Saline county issued to aid in the construction of said railway; and whereas, the sum of fifty thousand dollars of said bonds has been delivered by said Lawrence Savings Bank, trustee as aforesaid, to the assignee of said railway company:

Now, therefore, if the said Lawrence Savings Bank shall save the said Saline county harmless from all damage or loss by reason of the said delivery of said sum of fifty thousand dollars in bonds as aforesaid, in case the same shall be adjudged to have been prematurely delivered, or delivered in violation of the trust of said Lawrence Savings Bank, and

shall deliver into the possession of the state treasurer of the state of Kansas, upon the order of the chairman of said county board, the one hundred thousand dollars in bonds of said county still remaining in the hands of said savings bank as trustee, then this obligation shall be void; otherwise, shall be and remain in full force and effect.

LAWRENCE SAVINGS BANK,

*By John K. Rankin, Cash. Lawrence Savings Bank.*

ROBERT MORROW.

J. W. McMILLAN.

W. A. SIMPSON.

Thereupon, on July 17th, the board of county commissioners met, and passed these resolutions:

"Whereas, on the 15th day of July, A. D. 1873, it was ordered by the board of county commissioners as follows:

"'SALINA, KAS., July 15, 1873.

"'Ordered, by the board of county commissioners of Saline county, Kansas, that upon the filing with the county clerk of said county, and the acceptance of the same by the board of county commissioners, by the Lawrence Savings Bank, of a good and sufficient bond in the penal sum of one hundred thousand dollars ($100,000), conditioned to save Saline county, Kansas, harmless from any damage by reason of any premature delivery of Saline county railway bonds to Abram Cutler or his assigns, by said Lawrence Savings Bank, also conditioned that the Lawrence Savings Bank surrender the one hundred thousand dollars ($100,000) railway bonds now in their possession to the state treasurer, that the chairman of the board of county commissioners is hereby instructed to telegraph to the presidents of the stock exchanges of New York city, Boston, Philadelphia, Chicago, St. Louis, and Kansas City, Missouri, withdrawing the telegram of June 27th, 1873, having reference to Saline county bonds issued in aid of the Republican, Salina & Arkansas Valley railway company.'

"Whereas, on the 17th day of July, A. D. 1873, the Lawrence Savings Bank presented to the board of county commissioners of Saline county, for its acceptance, a bond for the sum of $100,000, and conditioned as set forth in the foregoing order of July 15th, 1873, which bond was in full compliance with the conditions of the order above mentioned; and which said bond was filed by the county clerk, and, upon motion of S. M. Palmer, seconded by H. F. Woolley, was duly accepted by the board as being in full compliance and conformity with the conditions of said order:

"Therefore, ordered, that the chairman of the board of county commissioners of said county of Saline be and he is hereby ordered to forthwith telegraph to the presidents of the stock exchanges of New York, Philadelphia, Boston, Chicago, St. Louis, and Kansas City, notifying said stock exchanges or the presidents thereof, that the said county of

Saline, by an order of the board of county commissioners of said county, do withdraw their telegrams sent to several boards of exchange on the 27th day of June, A. D. 1873, having reference to $50,000 of Saline county bonds issued to aid in the construction of the R. S. & A. V. R. W."

Nothing further seems to have done by the county until January, 1875, and then, on January 22d, this action was commenced. The amended petition sets forth in detail the various transactions which led to the issue and the placing of the bonds in the hands of the savings bank as trustee; the non-completion of the railroad, or of any such portion thereof as would entitle the company to any of the bonds; alleges a conspiracy on the part of the defendants to cheat and defraud the plaintiff out of these bonds, and a conversion of such bonds by them. After a protracted trial, the jury returned a general verdict in favor of the plaintiff, now defendant in error, and against Abram Cutler and such other defendants as are now plaintiffs in error. In addition to this general verdict, they also answered certain questions of fact submitted to them. So far as those submitted at the instance of the plaintiff are concerned, the answers simply stated that the bonds had been prematurely delivered, and showed such non-compliance with the terms of the proposition by Cutler and the railroad company, as made it clear that the bonds were wrongfully delivered. The record shows as to the defendants' questions, the rulings of the court thereon and the answers thereto, as follows:

If the jury find for the plaintiff against any of the defendants, except Abram Cutler and the Republican, Salina & Arkansas Valley railway company, then they will answer the following questions. If they find for the defendants, except as aforesaid, the questions need not be answered:

1. Did the defendant, John K. Rankin, deliver to Robert Morrow, defendant, the fifty bonds of Saline county (mentioned in plaintiff's petition) on the 24th day of June, 1873? —Yes.

2. Had said John K. Rankin, at the time of such delivery, any knowledge that the railroad had not been graded and the proper masonry put in through the county of Saline, pursu-

32—21 KAS.

ant to the proposition voted upon and accepted by the board of Saline county, as set forth in the plaintiff's petition? — Not that we know.

3. If the last above question is answered in the affirmative, then the jury will state when and how said Rankin obtained such knowledge and who communicated the same to said Rankin.

4. Did said Rankin act negligently in the delivery of said bonds to Robert Morrow? — No.

5. If the last above question is answered in the affirmative, then the jury will state in what such negligence consisted.

5½. Did the said defendant, John K. Rankin, before delivering said bonds, submit the question of the legality and propriety of such delivery to proper and competent legal counsel, and did he follow and act upon the advice of such counsel in making such delivery, and did he then believe such delivery to be legal and proper? — He did.

6. Did the defendant, John K. Rankin, have any pecuniary interest in the delivery of said bonds to the defendant, Robert Morrow? — Not that we know of.

7. If the above sixth interrogatory be answered in the affirmative, then the jury will state how said Rankin was interested in such delivery, and the extent, value and amount of such interest.

8. Did the governor of the state, prior to the delivery of said fifty bonds by said Rankin to said Morrow, certify that the Republican, Salina & Arkansas Valley railway company did have the said railroad graded, and the proper masonry put in, on the 19th day of May, 1873, through the county of Saline, from the town of Salina, Saline county, Kansas, to the county line of said county, in conformity to the terms of a proposition to said certificate attached? — Yes.

9. If the jury find that such certificate as is mentioned in the above eighth interrogatory was made, then they will find and state whether said Rankin delivered said bonds upon such certificate and under advice of competent legal counsel? — Yes.

10. Did the defendant, Robert Morrow, at the time of the delivery of said bonds to him, have knowledge that the Republican, Salina & Arkansas Valley railway company had not their road graded, and the proper masonry put in, through the county of Saline, as stated in the certificate of the governor? — We cannot say.

10½. If the jury answer the last above question in the

affirmative, then they will state when and how said Morrow received such information.

11. Did the defendants, John K. Rankin and Robert Morrow, or either of them, and if so, which, in any way procure, or aid in procuring the certificate of the governor hereinbefore mentioned, and if so, how?—No evidence to prove that they did.

12. Did the defendant, Jeremiah G. Mohler, act otherwise in the procuring the said governor's certificate, than as the attorney of defendant, Abram Cutler?—Yes.

13. Did the defendant, Jeremiah G. Mohler, conspire with any of the defendants in this action to procure the improper delivery of the said fifty bonds of Saline county by defendant, John K. Rankin, to Robert Morrow, and if so, with which of the defendants and when and where was such conspiracy formed?—Yes; with Abram Cutler.

13½. Did defendant, John K. Rankin, conspire with any of the other defendants in this action to cause the said fifty bonds of Saline county to be illegally delivered, and if so, with whom did he so conspire, and when and where was such conspiracy formed?—No.

14. What other persons, defendants herein, than John K. Rankin and Robert Morrow, if any such there were, took part in the delivery of said bonds on June 24th, 1873?—Don't know.

15. Did the defendant, William A. Simpson, ever conspire with any of the other defendants in this action to procure the delivery of said fifty bonds of Saline county without the party to whom the same were delivered being entitled thereto?—Don't know.

16. If the jury answer the last aforesaid question in the affirmative, then they will state with whom said Simpson conspired, and when and by what act he, the said Simpson, manifested his adhesion to such conspiracy.

17. Did the defendant, John W. McMillan, ever conspire with any of the other defendants in this action to procure the delivery of the aforesaid fifty bonds of Saline county without the party to whom the same were delivered being entitled thereto, and if so, with whom and by what act did he manifest his adherence to such conspiracy?—We don't know.

18. Did the defendant, Andrew Terry, ever conspire with any of the other defendants in this action to procure the unauthorized delivery of the said fifty bonds of Saline county,

and if so, with whom, where and by what act did he manifest his adherence to such conspiracy?—Don't know.

19. Did the defendant, Jeremiah G. Mohler, ever have any knowledge of or acquaintance with either of the defendants, William A. Simpson, Andrew Terry, John K. Rankin, John W. McMillan, or Robert Morrow, until after the delivery of said fifty bonds by John K. Rankin to Robert Morrow, on the 24th day of June, 1873, and if so, with which of the said defendants?

(Refused to be submitted, and excepted to by defendants, asking submission.)

20. Has Jeremiah G. Mohler ever seen or conversed with defendant William A. Simpson, or directly or indirectly ever had any communication whatever with said Simpson?

(Refused to be submitted, and excepted to by defendants, asking submission.)

21. Did the defendant, John W. McMillan, ever have any other interest in or connection with the said fifty bonds, excepting as he purchased the same in the ordinary course of trade for full value, and if so, the jury will state what said interest was?—Yes, an interest in common with Rankin, Morrow, Richardson, Cutler, Mohler, and Simpson.

22. Did John W. McMillan, at the time he purchased a part of the bonds in suit, so purchase the same on the faith of the telegrams of the plaintiff and the letter of the chairman of the board of county commissioners of Saline county, affirming their validity and stating that the interest thereon would be promptly paid at maturity?—Yes, partly.

23. Did the defendant, Abram Cutler, after the delivery of the said fifty bonds of Saline county by John K. Rankin to Robert Morrow on the 24th day of June, 1873, procure and deliver to the plaintiff a bond in settlement and satisfaction of the plaintiff's claim for damages on account of any premature delivery of said fifty bonds, and did the plaintiff accept such bond as full indemnity therefor?

(Refused to be submitted, and excepted to by defendants, asking submission.)

24. Has the plaintiff still possession of said bond?

(Refused to be submitted, and excepted to by defendants, asking submission.)

25. Did Robert Morrow, at the time he sold forty-four of said bonds to John W. McMillan, have in his presence or possession the telegram to the Lawrence Savings Bank, dated

July 17th, 1873, and signed by H. F. Woolley, chairman board of county commissioners, withdrawing their former telegram discrediting said bonds, and also the letter of the said chairman of said board of county commissioners affirming the validity of said bonds and stating that the interest thereon would be promptly paid at maturity? — Cannot answer.

26. Did Robert Morrow sell said forty-four bonds to John W. McMillan upon the faith of said telegram and letter, and did said McMillan buy the same upon the faith of said telegram and letter? — John W. McMillan bought partly on the faith of the telegram and letter.  Robert Morrow sold wholly on the faith of what he received.

27. Did Robert Morrow loan money to Abram Cutler with which to carry on the work of grading and building the said line of railway, taking as security for said loan a pledge of forty-four of the fifty bonds first due and deliverable to said Cutler under his contract? — He did, according to the deposition of Abram Cutler.

28. If the defendant, Robert Morrow, had any other or different connection with Abram Cutler, or the said railroad enterprise in Saline county, than that stated in the last interrogatory, state what it was and when it began.

29. Did said Robert Morrow receive the said bonds to indemnify himself on said loan in pursuance of said pledge? — He did, according to the deposition of Abram Cutler.

30. If said Robert Morrow received said forty-four bonds otherwise than in pursuance of said pledge, the jury will find how otherwise.

31. Was Jeremiah G. Mohler entitled to receive six of said fifty bonds for services rendered said Cutler, when said bonds were deliverable under said contract between the county of Saline and the said railway company? — No.

32. Did Robert Morrow turn over for the benefit of Jeremiah G. Mohler six of said fifty bonds, supposing that the said Mohler was entitled to the same? — No.

33. Was Robert Morrow, under his contract with Abram Cutler for moneys loaned, entitled to receive forty-four of said bonds as an indemnity for such moneys loaned; and did he receive them believing himself so entitled? — As between Cutler and Morrow, he was.  We have no knowledge of his belief.

34. Did defendant, William A. Simpson, have any knowledge of the delivery of any of the coupons, or bonds men-

tioned in plaintiff's petition, until after they were so
delivered? Had he any interest in such delivery, and if so,
what interest?—We think not.

35. What was the market value of the bonds and coupons
mentioned in the plaintiff's petition on the 24th day of
June, 1873?—No evidence showing what it was.

Upon the record, counsel call our attention to various al-
leged errors:

1. In impanneling the jury.

2. In the admission of testimony.

3. In the instructions.

4. In overruling a demurrer to the evidence.

5. In refusing to submit certain questions to the jury.

6. In placing the jury in custody of the bailiff while the
court was adjourned for a couple of days to permit the judge
to open court in an adjoining county.

7. In refusing to enter judgment upon the answers to the
special questions in favor of the defendants.

8. And as to all the plaintiffs in error except Mohler, in
sustaining its jurisdiction over the action.

We shall devote our attention, in the first place, to the
question of the proper judgment to be entered upon the ver-
dict and the answers. So far as the defendant Mohler is
concerned, the inquiry is easily answered. Aside from the
inferences arising from the general verdict, the jury specific-
ally answer that he conspired with Abram Cutler to procure
the improper delivery of the bonds. He therefore stands
charged directly, as well as by implication, with the wrong
done to the county.

With reference to the other defendants, the inquiry is at-
tended with more difficulty. It will be necessary to consider
more particularly the charges in the petition, so as to deter-
mine the scope of the general verdict. It charges that de-
fendants fraudulently conspired to cheat and defraud the
plaintiff out of these bonds, and to convert the same to their
own use, and to put them into circulation without compliance
by the railroad company with the conditions upon which the

bonds might be properly delivered; that, in pursuance of such conspiracy, the savings bank and John K. Rankin, its cashier, delivered the bonds to Robert Morrow on June 24th, 1873, in order that the same might be by said defendants converted and disposed of to their own use; also, that on said 24th of June, 1873, and before the commencement of this action, said defendants fraudulently converted the bonds to their own use; also, that since the bonds were so delivered to defendant Morrow, the defendants put said bonds into circulation and disposed of them to *bona fide* holders; also, that said defendants, in pursuance of said conspiracy, knowingly aided and abetted each other in so placing, disposing of, and converting said bonds. Now the general verdict is an affirmation that these charges are true. In other words, it affirms that the conspiracy existed; that in pursuance thereof the bonds were prematurely delivered, were put into circulation, and disposed of to *bona fide* holders; and also, generally, that they were converted to their own use by defendants. Turning now to the special questions, we find that to several the jury simply answered, "Don't know." We have had occasion heretofore to refer to the irregularity of such answers. Answers should be direct and positive. A case is to be tried upon the evidence, and according as an alleged fact is or is not established by that evidence, it does or does not for the purposes of that case exist. The main object of special questions is, to bring out the various facts separately, in order to enable the court to apply the law correctly, and to guard against any misapplication of the law by the jury. It is matter of common knowledge, that a jury influenced by a general feeling that one side ought to recover, will bring in a verdict accordingly, when at the same time it will find a certain fact to have been proved which in law is an insuperable barrier to a recovery in accord with the general verdict. And this does not imply intentional dishonesty in the jury, or a failure on the part of the court to instruct correctly, but rather a disposition to jump at results upon a general theory of right and

1. Special questions to jury; answers should be direct and positive.

wrong, instead of patiently grasping, arranging and con-
sidering details. Scarcely any jury will, when questioned
as to a single separate fact, respond that it exists, without
some sufficient evidence of its existence. Its response will
as a rule be correct, if direct, and if not correct, then
evasive and equivocal. And such evasive and equivocal
answers always cast suspicion on the verdict. The sugges-
tion springs almost involuntarily, that the answers are thus
evasive and equivocal from an unwillingness on the part
of the jury to stultify themselves so far as to say that the
facts were or were not proved, mingled with a fear that a di-
rect and positive answer will avoid the effect of the general
verdict they have returned. We do not mean to affirm that
this is always the case, or that, in fact, such were the motives
that influenced the action of this jury, for sometimes, doubt-
less, the jury are really uncertain as to the fact, and at the
same time their verdict should be in favor of the one party,
whether the fact did or did not exist. It is therefore a right
of a party to have a direct response to the questions. Here,
however, the parties were content to abide by these answers;
and each party when invited by the court, declined to ask
for further or more specific answers. Now what construction
is to be placed upon such answers? They imply a denial of
the existence, or perhaps more correctly, of
proof of the existence, of the facts concerning
which the questions were propounded. And
one, for all the purposes of the case, is the same as the other.
And this lack of proof operates against the party who needs
to make the proof. Take the case at bar: If, for instance,
it was necessary to sustain plaintiff's recovery against defend-
ant Simpson, to show that he was a party to the conspiracy,
then an answer that the jury "don't know" whether he was
or was not such a party, is equivalent to saying that the fact
was not proven; and so, for all the purposes of the case, it is
to be taken as not a fact.

The allegation in the petition is, that the bonds were de-
livered by the trustee on June 24th, 1873, and so the jury

2. Jury answer-
ing "We don't
know," tanta-
mount to a
simple denial.

find. They also say that none of the defendants, save Ran-
kin and Morrow, took part in such delivery; (Question
No. 14.) The jury find that neither McMillan, Terry nor
Simpson conspired with any of the other defendants to pro-
cure such delivery; (Questions Nos. 15, 17 and 18.) The
jury show that they took no part in the delivery, and were
not in the conspiracy to effect the delivery. They were
neither the real actors nor conspirators with the real act-
ors. If the wrong then charged was simply the obtaining
of the bonds from the hands of the trustee, these answers
would seem clearly to relieve these defendants from liability.
But, say counsel for the county, the wrong charged is not
simply obtaining the bonds from the trustee, but passing
them into the hands of innocent holders, thus putting it out
of the power of the county to defend against or to recover
the bonds, and making the wrong profitable to the wrong-
doers. And while Simpson, McMillan and Terry may have
been entirely innocent and ignorant as to the first wrong, yet
they afterward came into the conspiracy and assisted in put-
ting these bonds into circulation, and thus became jointly re-
sponsible with the original conspirators for the conversion —
and all this is implied in the general verdict. As for instance,
if two parties were sued for the conversion of certain property,
and it appeared upon the trial that one stole and the other
thereafter helped to dispose of the property, the latter would
be equally responsible with the former, though he had noth-
ing to do with the larceny, providing that at the time he as-
sisted in disposing of the property he knew that it was stolen,
and was helping the thief to profit by his larceny. He aids
in completing the wrong; and a special finding that he had
nothing to do with the larceny in the first place, and was in
fact entirely ignorant of it at the time it was perpetrated, is
not so inconsistent as to avoid the effect of a general verdict
against him.

That the jury intended only this by these answers is, it is
said, made more clear by the answer to the 21st question, in
which they say that McMillan had an interest, in common

with Rankin, Morrow and the rest, other than as he purchased
the bonds for full value in the ordinary course of trade.
What such interest was, is not disclosed, but the affirmation
is that there was a community of interest, and an interest
other than such as would result from the ordinary purchase
and sale of bonds.   But a community of interest suggests a
community of purpose; and an interest other than that of
an ordinary purchaser or vendor, implies, under the circum-
stances of this case, an interest in the wrongful delivery and
conversion of the bonds.   If these parties were successive pur-
chasers in good faith, how would they have any interest in
common?   The very idea of succession implies a want of
community, and outside the interest as purchasers and ven-
dors of these bonds, no other interest is suggested in the
pleadings than that of conspirators in the success of their
conspiracy.

This argument is strong.   Technically, it is correct; for
the allegations of the petition are broad, and it is possible
for these defendants to have been free from all connection with
the delivery of the bonds to Morrow—indeed, to have been
at the time entirely ignorant of it, and yet to have afterward
so connected themselves with the disposal of the bonds as to
be in law equally responsible for their conversion.   But when
we examine the testimony, and read the instructions of the
court, there is strong reason to believe that the jury under-
stood these questions to be as broad as the allegations of the
petition, and hence returned the evasive answers.   The court
commenced its charge in these words:

"The theory of the plaintiff in this case is, that the de-
fendants, and each of them, conspired and confederated to-
gether to get possession of and convert to their own use,
unlawfully, the fifty bonds, and coupons attached, mentioned
in the pleadings and evidence in this cause.   The defendants,
on the other hand, deny that there was any conspiracy upon
their part in that respect, and say that the bonds were
properly delivered and purchased by them in good faith, and
for value."

And again, further on, it used this language:

"This is the important question in the case, *i. e.*, to determine if there was any conspiracy upon the part of any two or more of the defendants."

And such was the tenor and effect of the entire charge. It placed before the jury as the pivotal fact, the existence of a conspiracy to wrongfully obtain the possession of these bonds, and asserted a liability upon all who were members of such conspiracy. It defined the meaning of the term conspiracy, gave the rules of evidence for determining its existence, as also, who were its members, and responsible each for the actions of the others. And going beyond the instructions to the testimony, the evident aim of that was to link all the defendants in a single conspiracy, and make all the various acts of the several parties their appointed contribution to the consummation of the single wrong. It is impossible to read the testimony without being convinced that the case was tried upon the assumption on the part of the plaintiff, that the defendants were all parties to the conspiracy to obtain possession of the bonds. Even with regard to the explanation suggested by counsel, that these defendants did not enter into the conspiracy until after the actual delivery of the bonds, is it not true that he who enters in at any time, becomes party to, and responsible for all the acts done in furtherance of the conspiracy, *ab initio?* We quote from counsel's brief:

"Every one who enters into a common purpose or design is deemed, in law, a party to any act which had before been done by the others, without regard to the time at which he entered the combination, and is a party to every act which may afterward be done by any of the others, in furtherance of such common design. (Wharton's Am. Crim. Law, 325; 2 Russell on Crimes, 698.)"

Is not this a correct statement of the law?—and is not a finding that they did not conspire to procure the wrongful delivery of the bonds, tantamount to a finding that they were not parties to the conspiracy to defraud the county, either before or after the actual delivery by the trustee to Morrow?

Passing by the doubt which hangs over the intention of the jury in these answers, to an examination of the testimony—

and as the bulk of this, so far at least as it attempts to connect these three defendants with the wrong, is in deposition, we can properly review it and determine its weight nearly as well as the jury — and it seems to us, that there was not sufficient to justify any verdict against these parties.

So far as Terry is concerned, the only connection he is shown to have had with the bonds is, that as president of the savings bank he received an order for these bonds, went to Winslow, Lanier & Co., and obtained the bonds; that he offered them for sale, and failing to find a purchaser, left $100,000 in New York subject to the order of the savings bank; brought the remaining $50,000 to Lawrence and placed it in the vault of the savings bank. It is not shown that he participated in the delivery of the bonds to Morrow, or was present at the time, or even knew of its being done. None of the bonds are shown to have passed into his possession after the delivery, nor does it appear that he ever had a dollar's worth of interest in them or profited in any manner by the transaction. If it be said that he was president of the bank named as trustee, and therefore responsible for what the bank did, we reply that whether the acceptance of the trust by the bank was *ultra vires* or not, an officer of the bank who took no part in and was not privy to and had no interest in the delivery of the bonds and who was not specially charged with their care and custody, will not be responsible for the delivery by another officer made without negligence upon the advice of competent legal counsel, although it should afterward appear that such delivery was in fact premature and wrongful.

So far as Simpson is concerned, his connection with the transaction consisted simply in signing as one of the sureties the bond executed by the bank to the county after the question was raised as to the propriety of the delivery to Morrow. It is true that about the time Cutler commenced work in Saline county, he applied to Simpson for pecuniary aid in carrying on the work, but the application was declined. And it is also true that testimony was admitted of Cutler's statements

when he first visited Salina to secure his contract, that Simpson was interested with him and that he was to get money from Simpson's bank, etc. But such testimony is of no earthly value to connect Simpson with the conspiracy or the conversion. It is as to him the merest hearsay.

The testimony places McMillan in a different attitude, for it shows that he purchased from Morrow the forty-four bonds, and thereafter disposed of them to other parties. Now such purchase may have been in good faith, or merely colorable, to assist in putting the bonds into the hands of *bona fide* holders and as his appointed part in carrying out the common purpose of wrong. To determine which was the fact, it will be necessary to consider briefly the conduct of others, and also the conduct of the authorities of Saline county. And it will be borne in mind that his sharing in the purpose of wrong, his connection with the conspiracy, must be shown, and is not presumed. He is presumed innocent until the contrary appears. Mere negligence even does not make him a wrong-doer or a conspirator. Knowledge of the wrong and an intention to assist are essential. And first, it will be noticed that the governor had given a certificate as contemplated by the terms of the original proposition to the county. Such certificate was, to say the least, one calculated to mislead. The proposition contemplated but one certificate, and that not to be issued until the time at which the company should be entitled to receive $50,000. That certificate was to be of the completion of the grading and masonry through the county, and was also to state the time of the completion of such work through part of the county as the date for the commencement of interest on all the bonds. Such certificate was to be the evidence upon which the trustee was to act, for while the language is not entirely perspicuous, it can hardly be that the parties intended that a trustee, for whose compensation no provision was made, should himself come to Saline county and make a personal examination. The issue then of a certificate by the governor would naturally suggest that the time for the trustee to deliver the $50,000 of bonds had

arrived. And a mere casual examination of the certificate actually made would only confirm this impression, for he certifies that the work has been completed "through the county of Saline . . . in conformity to the terms of the proposition." A more careful reading, however, would show that it does not go to the full extent required by the proposition to entitle the railroad company to the bonds. Yet upon this certificate the attorney general certified that the bonds were entitled to registration, and the auditor registered the bonds.

Again, on the 11th of June the county commissioners had passed a resolution stating that they had passed over and examined the work, and that between Salina and the south line of the county the work had been done according to the true intent and meaning of the proposition — a statement which the testimony in this case would seem to show was entirely unwarranted. And after the delivery of the bonds, and a dispute had arisen as to the propriety of that delivery, the county commissioners had accepted a bond, upon which McMillan was one of the sureties, as a settlement of the dispute, and had withdrawn their adverse telegrams. In addition thereto, the chairman of the county board had written to the contractor this letter:

"SALINA, KAS., Aug. 4, 1873.

"*Abram Cutler, Esq., Supt. and General Manager R. S. & A. V. R. W. Co., Salina, Kansas*—DEAR SIR: In reply to yours of 2d inst., I will say that I have no doubt that the interest on the $50,000 voted in aid of the R. S. & A. V. R. W. will be paid promptly when due.

"Yours truly, H. F. WOOLLEY,

"*Chairman Board County Comm'rs.*"

Of all these facts McMillan had knowledge at the time he purchased. This purchase was not made until after the date of the letter just quoted, which was some six weeks after the delivery of the bonds, and after the commissioners had knowledge of such delivery, and nearly three weeks after the commissioners had accepted the bond of indemnity and withdrawn their adverse telegrams. The circumstances of the

purchase do not cast suspicion on the transaction. Mr. McMillan had been for some years in the banking business at Lawrence, and was at the time president of the Second National Bank of that city. The price paid was reasonable— about what, from the other testimony, would seem to have been the market value of such bonds of unquestioned valid- ity. He disposed of the bonds thereafter to apparently *bona fide* purchasers. He paid for the bonds, and received pay for them; and the manner of adjusting and making these payments was not such as would be resorted to by parties conscious of wrong-doing, and seeking to place a color of fair dealing upon a dishonest act. To conclude, then, as to these three parties, it seems to us that looking simply at the pleadings, the verdict, and the answers to the special questions, it is a matter of doubt whether judgment should not have been entered in favor of, instead of against, them; that, interpreting the answers by the instructions and the testimony, it should have been entered in their favor; and that upon the testimony in the case they were entitled to a verdict and judgment. As all the testimony pointing against them was admitted before the plaintiff rested, the court erred in not sustaining their demurrer to the evidence.

We pass now to a consideration of the case as it stands against the defendant Rankin. He was the cashier of the savings bank, and the officer who delivered the bonds to Morrow. Two questions arise as to him: Was he a member of the conspiracy to obtain the wrongful possession of the bonds? If not, and he acted innocently in the matter, is he responsible to the county for his error of judgment in prematurely delivering the bonds? From the answer to the second question, construing it in the manner we have heretofore indicated was proper, it appears that he had no actual knowledge of the non-completion of the proper amount of work at the time he made the delivery. It also appears that he was not guilty of any negligence in making the delivery; (Question No. 4.) That he submitted the question of the legality and propriety of such delivery to proper and competent

legal counsel, acted upon the advice of such counsel, and believed that delivery legal and proper; (Question No. 5½.) That he had no pecuniary interest in such delivery; (Question No. 6.) That he had before him the certificate of the governor, and acted upon such certificate and the advice of counsel; (Questions 8 and 9.) That he did not procure or aid in procuring such certificate of the governor. (Question No. 11.) That he did not conspire with the other defendants to cause the illegal delivery of said bonds; (Question No. 13½.) These answers leave as the only possible grounds for sustaining the general verdict, either that he entered into the conspiracy after the actual delivery, and then illegally and knowingly contributed to the conversion of the bonds, or that the fact of a wrongful and premature delivery renders him liable, independent of any question of knowledge or intent. With reference to the first, we need add nothing to what we have already said, when construing the verdict as to Simpson, Terry and McMillan. With reference to the second, it implies these two propositions: 1st, That a trustee, acting in good faith upon the advice of competent counsel, is responsible for any error in his judgment or mistake in such advice; and 2d, That where such trustee is a corporation, the officer thereof, who actually performs the duty intrusted to the corporation, is also personally responsible for any such error or mistake. We do not understand that to be the law. A trustee is not an insurer. He is not absolutely bound for the results of his actions. He must exercise the highest good faith.

5. A trustee not an insurer; his duties.

He may not speculate in the property placed in his hands. He may not acquire any interest adverse to the trust. He is bound to use care and diligence in the execution of the trust and the management of the trust property—as much care and diligence as a man of prudence would in his own affairs. Having done all that, he is not responsible for mere error or mistake. A trustee to loan, may loan on security which proves insufficient or the title to which fails; a trustee to sell, may sell at a price below that which might have been obtained; but if he has acted in good faith,

with reasonable diligence, and upon the advice of competent counsel, he is free from personal responsibility. Any other rule would cast upon a trustee a burden which no prudent man would ever assume.

Turning now to the testimony, and it justifies these findings of care, good faith, etc., in the delivery of the bonds, and it fails to show any subsequent coming into the conspiracy, or any wrongful assistance in the subsequent disposition of the bonds. True, it appears that after McMillan had obtained these bonds, he transferred twelve to Rankin, but the testimony shows that Rankin purchased them for a gentleman named Baldwin, living in Waterbury, Conn. Mr. Rankin also, as cashier in behalf of the bank, signed the bond of indemnity executed to the county after the delivery. Both of these transactions seem to have been in good faith, and we cannot conceive why these, unaccompanied by evidences of wrongful intent, should be made the basis of recovery against this defendant. We shall not recapitulate the circumstances attending the delivery, as in respect to that the jury exonerate Mr. Rankin, and it is enough to say that the testimony justifies such finding.

We pass now to a consideration of the case as it stands against the defendant Morrow; and here the peculiar answers made by the jury to some of the questions surround the question as to the effect of these answers with doubt and difficulty. It appears that he was the party who received the bonds from Rankin; (Question No. 1.) That at the time he did not know whether the proper amount of work had actually been done; (Question No. 10.) That he did not procure or aid in procuring the governor's certificate; (Question No. 11.) The answers to these questions tend to exculpate Morrow, but still they do not exclude the idea of Morrow's connection with the conspiracy; neither is there any direct assertion anywhere in the answers that Morrow was not in such conspiracy. In this respect there is a marked and significant distinction between Morrow and the four defendants, whose connection with the case we have just been consider-

33 — 21 KAS.

ing. · Such an omission can ·hardly be deemed accidental. As he actually received the bonds from the trustee, and put them into circulation, a general verdict against him under the charge of conspiracy and wrongful conversion would seem to be conclusive, unless there be some plain denial of wrongful intent in such transaction. None such is found in these answers. In response to the 25th question, the jury say they cannot answer. This is about equivalent to the "Don't know" of which we have heretofore spoken, and must be taken as asserting that Morrow did not have the telegram and letter referred to. Yet such conclusion is not at variance with what is implied, if not asserted, in the very next answer, for there it is said that McMillan, who bought from Morrow, bought partly on the faith of said telegram and letter, and that Morrow sold wholly on the faith of what he received; and this in response to a question whether Morrow and McMillan respectively sold and bought upon the faith of said telegram and letter. Unsatisfactory as are these answers, they are not so much so as some that follow. The 27th and 29th questions the jury answer by saying that "He did according to the deposition of Abram Cutler." This amounts to nothing. It is simply a statement of the import of some part of the testimony. But was the testimony true? Was the fact as stated by the witness? To determine this is the function of the jury. A stenographer will give us the testimony. An inference might be drawn from the form of the answer that the jury did not believe the witness, but it would be simply an inference. The most that can be said of this is, that the jury stated the testimony, and referred the question of fact to the court to determine. Such an answer may be, should be, wholly disregarded.

The answer to the 32d question seems to fully imply knowledge, at least, of the wrong on the part of Morrow, or else is entirely immaterial, according as the negation goes to the belief of Morrow as to Mohler's rights, or the fact of Morrow's turning over to Mohler the bonds.

The answer to the 33d question does not relieve Morrow,

for while it shows that, as between Cutler and himself, he was entitled to the bonds, it is limited solely to that, and when considered in reference to the question asked, excludes the idea of any absolute right to the bonds, and also any belief on his part that he was in fact so entitled.

It follows from this examination that, upon the pleadings, verdict and answers, the judgment was properly rendered against Morrow and Mohler, for the reason that, as to the former, the answers are not inconsistent with and do not therefore overbear the verdict; and as to the latter, the answers are in accord with and support the verdict. As to these two parties, therefore, the inquiry is, whether there was any error in the trial sufficient to compel a reversal of the judgment, and if not, whether the testimony was sufficient to sustain a verdict against them. As to the former, we think little need be said.

9. General verdict; its conclusiveness.

So far as any question arises on the impanneling of the jury, nothing appears outside of the journal entry; and eliminating therefrom all mere matters of evidence which are improperly there entered, there is nothing to show any impropriety or irregularity in the matter. (*McArthur v. Mitchell,* 7 Kas. 173.) So far as the testimony is concerned, some of it seems unnecessary, and a useless cumbering of the record, but none of it such as would justify a reversal so far as these two defendants are affected. Cutler's declarations were admissible against him. So far also as they affect these parties, they were substantially made good by his testimony; and that certainly was as strong as his declarations. There was sufficient *prima facie* evidence of the signatures to the various telegrams to justify their admission; and independent of the question whether they were shown to have reached the parties to whom they were addressed, they were competent as written admissions or statements of the parties whose names were subscribed thereto.

6. Evidence improperly in journal entry, to be disregarded.

Objection is made also to the action of the court in refusing

to submit to the jury the question of the giving and accept-
ance of the indemnity bond. That such a bond was given is
undisputed, and the court might properly have submitted the
question. But still we think that upon the theory of this
case of a conspiracy, the execution of such a bond would not
prove a bar to the action. It would be but one fact in the
case; evidence *pro* or *con* on the question of the conspiracy,
and not a merger of the cause of action for the conspiracy.

Error also is alleged in adjourning the case from Saturday
until Tuesday, and committing the jury meantime to the cus-
tody of the bailiff. In making such adjournment, which was
made on Saturday night at 11:45 o'clock, the court directed
the bailiff in charge of said jury to keep the jury in his
custody, excepting that he might allow them to separate at
six o'clock P.M. until nine o'clock A.M., and also each day
from twelve o'clock M. until half-past one o'clock P.M. for
the purpose of dinner, and at the same time duly admonished
and cautioned the said jury; and the jury were thereupon
permitted to separate until Sunday morning at nine o'clock.
Nothing further appears of record until Tuesday morning,
when the court again convened and the jury came in and re-
turned their verdict. That such a proceeding was irregular,
we are all agreed; and that it is an irregularity which calls
for a reversal, the writer of this opinion is inclined to think.
The court may have power to permit the jury to separate,
but can it delegate such power to the bailiff? Must it not
determine the question at each time of separation, and ought
it not then to admonish the jury? My associates, however,
incline to the opinion that though irregular, the
proceeding does not appear to have wrought any
prejudice to the substantial rights of the defend-
ants. It does not appear that the jury were not
in fact kept together from the moment they convened on
Sunday morning until the court met on Tuesday. Nothing
is shown as to what transpired between the hour of adjourn-
ment on Saturday and the convening of the court on Tues-
day, and in the silence of the record injury will not be

8. Irregularities
insufficient to
reverse judg-
ment in civil
case.

presumed.　The rule might be more strict in a criminal case, and under the circumstances in such a case it might be the duty of the court to grant a new trial.　But in a civil action this irregularity is not deemed of sufficient moment to justify this court in setting aside the verdict.

These are all the matters suggested as occurring during the trial which we deem necessary to notice, and as to these we have simply mentioned our conclusions without entering into any lengthy discussion.　We pass then to the final question, and that is, whether there was sufficient testimony to sustain the verdict as to these defendants.　And here the question as often stated is not whether, upon the testimony, we should have come to the same conclusion, but whether there was testimony which, uncontradicted and unexplained, is sufficient to sustain the verdict.　This question must be answered in the affirmative.　There was testimony tending to connect these parties with a conspiracy to wrongfully obtain and convert these bonds, and testimony which, disregarding all contrary evidence, was sufficient to justify the verdict.　A brief glance at some of the items of testimony is all that we shall attempt. And first, as to Mohler.　He was living in Salina, and as a citizen there, interested in the welfare of the city; would probably know whether work was being done on the line of the railroad north, as well as south, of Salina.　He was the attorney of the contractor, Cutler, as prior to the contract between the railroad company and Cutler, he had been the attorney of the company.　Under such circumstances, it is not reasonable to suppose that he was ignorant of the fact that no work had been done north of Salina.　Would he not know whether the right of way had been obtained or not? Again, he was instrumental in obtaining the evidence upon which the governor's certificate was issued.　Could he still be ignorant of the extent of the work done?　Certainly a jury would be warranted in finding that he knew exactly the situation, and that the bonds were not in fact earned.　Further, he was during that year a partner with T. F. Garver in the practice of the law.　A contract in writing of date June 3,

1873, was entered into between Mohler and Garver on the one side, and Cutler on the other, for services of the former for one year for $400 cash and one $1,000 bond of Saline county. Mohler testified that the firm had no previous employment from Cutler, but that Cutler agreed with him about the 29th of March, 1873, to give him $6,000 of these bonds if he should procure a rescission of the order of the county commissioners of March 29th, 1873, requiring the railroad company to give a bond. This rescission was made April 1st, 1873. Mr. Garver was not informed of this employment, and received none of these bonds. Cutler testified that the contract with Mohler for the $6,000 bonds was for legal services as to any and all matters pertaining to the construction of the railroad.

Now the inquiry which naturally suggests itself is, if this employment was for professional services, why was his partner excluded from knowledge of the employment and share in the compensation; and why this formal written contract about two months thereafter with the firm of Mohler & Garver for a year's services? And if the employment was not for professional services, would any legitimate transaction justify the giving away of about one-eighth of the first series of bonds to induce the county commissioners to recede from the precautionary measures they had already taken to protect the county against just such rascality as afterward took place? Again, as showing knowledge and assistance, it appears that on the 23d of June, the day on which the bonds were registered, Cutler telegraphed from Topeka to Mohler to have the chairman of the county board say who signed the bonds; and on the same date, at the instance of Mohler, two telegrams were sent from the chairman and one from the county clerk to Cutler in reference to the issue and signature of the bonds. On the 24th, as we have seen, the bonds were delivered by the trustee to Morrow upon the order of Cutler. The order specified no number of bonds, but Morrow received fifty, the entire number then in the vault of the savings bank, giving a receipt for the fifty, and immediately deposited six in said

bank for Mohler. On the 25th and 27th, respectively, Mohler
sent these telegrams:

. "SALINA, KANSAS, June 25, 1873.

*"To R. G. Jamison, Esq., Cashier State Bank, Lawrence,
Kansas:* See cashier savings bank, and ascertain whether the
papers I wrote you about are on deposit there to my credit.
Answer.                    .        J. G. MOHLER."

. "SALINA, KANSAS, June 27, 1873.

*"To Maj. J. W. Johnston, President State Bank, Lawrence,
Kansas:* Please do not mention any correspondence I have
had with your bank. Speak to Jamison and Crommie.
Answer.                         J. G. MOHLER."

"(17–Pd–110.–Collect of Cutler.)"

And on the same day he wrote, at the dictation of Cutler,
a dispatch of the latter to Rankin, the cashier of the savings
bank, to "divulge no names of parties having bonds."

Without further noticing the testimony in detail, it seems
to us that the jury were warranted in concluding that Mohler
knew that the bonds were unearned, and that Cutler was
seeking to obtain them before he was entitled thereto, and
that he lent his services to Cutler to accomplish this wrong
upon the county, in consideration of the promise and receipt
of a no trifling share of the bonds.

As to Morrow, the question is not so clear. Indeed, the
Chief Justice inclines to the opinion that the testimony is not
sufficient to warrant the judgment against him. The other
judges think, however, that the case as to him comes within
the settled rule of decision in this court as to the conclusive-
ness of a verdict upon questions of fact. Morrow was the
party who received the bonds from the trustee and put them
into circulation. Prior thereto, and from the commencement
of the work, he advanced money to Cutler, the contractor.
He was present, assisting in securing the registration of the
bonds. Seven days after the governor's certificate, we find
Cutler telegraphing to him to have the savings bank accept
the trust for the bonds, and his dispatch to Cutler, inquiring,
"Have you got matters fixed with Woolley? Can I help
you by coming to Salina?" On receipt of the bonds, he

deposits six in the same bank, to the order of Mohler. And when sued on a charge of conspiracy to cheat and defraud the county of these bonds, he offers no syllable of his own testimony as to his acts in the premises, his knowledge or his ignorance of the facts, the moneys he advanced and the moneys he received, or any other matter to show him innocent of wrong. And the testimony of Cutler, which is offered for the defendants is of that character which, as has been said, "damns the witness and ruins the client." One closes the perusal of his testimony with little confidence in the credibility of the witness, and with strong suspicions of the *bona fides* of a transaction in which he was one of the prime actors.

Giving weight to all the testimony, and considering the relations of Morrow to the principal facts in the case, his conduct as shown by others, his silence as a witness, and the presumption of knowledge existing in favor of one who had so much at stake, and we are forced to the conclusion that it cannot be said, as a matter of law, that there was no testimony to support the verdict and judgment against him.

This disposes of the case; and we can only say in conclusion as at the commencement, that we have given the voluminous record a protracted and careful examination. We believe we have considered every question, and weighed every part of the testimony, and the conclusion we have reached, while not entirely satisfactory or free from doubt, is our best judgment in the premises.

The judgment of the district court as to Mohler and Morrow will be affirmed; and as to Rankin, Terry, Simpson, and McMillan, the judgment will be reversed, and the case remanded with instructions to sustain their demurrer to the plaintiff's evidence.

The costs in this court will be divided between the county and the defendants, Mohler and Morrow.

All the Justices concurring.